Good morning, Your Honor. Pat Whalen for Appellant and Cross Appellate California Tow Truck Association. The City of San Francisco has enacted a broad permit scheme. It can't be shoehorned into any of the exceptions to the preemption in F4A. The F4A has an express preemption provision subject only to a few limited exceptions. The City is charging substantial fees, thousands of dollars of fees per company, that directly burden their prices, routes, and service under the F4A. What's interesting is when you look at the findings of the City of San Francisco, there's a broad consumer protection emphasis. We want to ensure people learn about their rights and be provided pamphlets in different languages and so forth, all of which may be very noble goals, but Congress has said that's not what state and local regulation can cover. It can only cover safety. There's a very limited safety focus in the findings. They're only concerned with really two kind of odd subsets of towing. It's illegal towing from private property that either occurs at night or occurs with respect to people that are either senior citizens or people with disabilities. And putting aside the fact that I don't know how a towing company would ever tell what kind of person owned the vehicle that was towing, nevertheless, the expressed safety concern of the Board of Supervisors was that limited type of towing. And in response, they've enacted this broad scheme that applies to any tow firm that does any business in the City or even operates or drives a vehicle in the City. Could I ask you a question about the district court's procedure? That was confusing to me. The district court, and I think all the arguments that I've seen, are based on a challenge to the permit scheme as a whole. And the district court actually sliced up the permit scheme, saying consensual versus non-consensual. But in our opinion in 2009, the ATA opinion, the panel goes out of its way to say you have to do this on a provision-by-provision basis. You can't do it on a whole scheme. Does that mean that the approach that the district court is wrong, or is this permit scheme somehow distinguishable from what we said in that 2009 opinion? I can't envision how this permit scheme is distinguishable. In fact, as I've advocated in my briefs, you're exactly right. It needs to be provision-by-provision. And in our opening brief on page 20, we specify the exact provisions that we're challenging. It's a fairly broad permit scheme, and we're only challenging, I don't know, eight or ten of the provisions. They go to the core of the permit scheme because we challenge the notion that you need to have a permit at all. We challenge the notion that you can charge these fees. We challenge the notion that you can be prohibited from getting a permit because of certain criminal offenses, for example. I'm still confused because, on the one hand, you seem to be just challenging overall the permit scheme, that the entire permit scheme is preempted. That's the way the complaint reads, and that seems to be the way the briefing was before the district court. But yet you also, it seems to me, want to have it the other way, too, which is, oh, and then you have to dissect this provision-by-provision. In response to Judge Akuta's question, if you could comment, the Port of Los Angeles, I mean, that was a — that covered many different areas, right? I mean, I suspect that was hundreds and hundreds of pages of regulation. And what they were doing there is breaking it down into smaller pieces. But one piece might be a maintenance requirement. One piece might be a permit requirement. In other words, did anyone slice it that thin that you look at, within this permitting system, the brochure versus the, you know, safety inspections versus something else? And so it all is sort of murky because it's a little unclear to me what your challenge was. And it seemed to me the district court looked at it as facially, looking at the entire scheme. And that's what you argued below, so I'm not sure we can really look at it any differently now. Well, I would agree that to the extent we were challenging the threshold issue of whether they can even require tow truck firms and drivers to get a permit at all, that would, in effect, eviscerate the rest of the scheme. But we really were very specific below citing to the various provisions within the San Francisco Police Code that we were challenging. And just as a for instance, if the only thing the city did was say you need to get a permit, same way you need to get a business license, something very generic like that. First of all, our folks probably wouldn't be complaining. And second of all, the city would probably argue that doesn't affect prices, routes, or service. What really is at issue here is when you impose this scheme and then charge thousands of dollars per company and then impose all sorts of additional burdens and requirements on the tow truck drivers and companies, that's when you start to see the impact on prices, routes, and service, which is what the F4A is concerned about. So without suggesting I'm trying to have it both ways, the reality is you have to first look at the effects of the permit scheme to see if it even falls within the ambit of the F4A to begin with. And only then do you see if any of its provisions can be saved by virtue of the safety exception. And our contention is that when you take the analysis of this court from the ATA case, you say it's a two-pronged test. What was the intent of the Board of Supervisors? They were quite clear about the precise types of towing they were concerned about in the safety context. Does the permit scheme address those? When I look at the brochure provision, which I think it's you have to have brochures when somebody comes and picks up their vehicle, you go, well, what's the safety? I know they have a lot of safety findings, but since it happens after you already pick up your vehicle, it's already been towed, it seems raises a question. But then I ask the other question, which is, well, would that type of provision be preempted at all? Because it doesn't seem to relate to rates, rats, and services. So should there have been — if you're doing a provision-by-provision analysis, wouldn't you also have to look at whether it's preempted at all? I guess my response to that would be that I think would clearly fall within the type of service that you're being mandated to supply to your customers that has a cost, perhaps incidental cost, but nevertheless you're mandating a service that also has an indirect impact on price. So I would say it very well would be covered. But I'll be honest here. The issue for our folks is the exorbitant fees, which has a direct impact on their prices and also impacts their routes for those companies that choose not to pay the fees and go around the city. I mean, that's the principal basis for the challenge. There are certainly other provisions that are offensive to F4A, but from a business perspective are, you know, more easily dealt with than having to exorbitantly increase your overhead. So just to clarify, you said if they had just required a business license, that would have been okay. But if they're requiring fees, then it's not. To be clear, what I intended to say was if all they required was a permit, I suspect our folks wouldn't be challenging that. A permit for free. Right. And I suspect the city would argue that it didn't impact price, routes, or service. You only came forward with your challenge after the price rose dramatically. Isn't that right? The price was a lot lower previously. It jumped up considerably. That's when the challenge came. I can't speak to the history, but I know that when our folks came to us, it was very expensive, yes. And so when I look at what the permit scheme does, again, all of the broad consumer protection statements in the findings that the Board of Supervisors make, I think, do two things. One, it illustrates that their predominant concern was consumer protection rather than safety. And, two, it says, well, if their limited safety concern is just illegal towing from private property at night, why do we need this broad, expansive scheme? Well, why not go with what Judge Breyer did then? Why not break it up into two, the consensual and nonconsensual? Congress seems to be doing that, breaking it up into consensual and nonconsensual in, I think, the 95 amendments, or 2005 amendment. Other states are doing that, breaking it up consensual and nonconsensual. So he's following a pattern that's sort of already out there a little bit, and clearly the Board of Supervisors expressed concern about safety-related issues for the nonconsensual towing as to nighttime on private property and seniors and disabled. Then the question becomes, is that generally responsive, or is it too broad for the nonconsensual? And why isn't it — why isn't that a close enough fit? I mean, does the glove have to fit perfectly? Well, one answer is, as a purely practical matter, very few towing firms engage in only one type of towing or another. So most, if not all, engage in at least some percentage of nonconsensual towing. So while I appreciate the intellectual exercise of trying to distinguish between the types of towing, in the context of a permit scheme, if you're going to say that it applies to nonconsensual towing, you're effectively saying it applies to all tow firms. So the very dichotomy you were trying to strike doesn't work. But Congress created that dichotomy in the 2005 amendments. But all they said as to nonconsensual towing was you could regulate price. They didn't say you could regulate all other aspects of the business. In fact, quite the contrary. When you look at the congressional record, they say this limited exception, that we're adding a new exception to preemption only on price of nonconsensual towing, but we are not at all intending to permit the wholesale re-regulation of the industry that existed prior to deregulation. So they were quite clear that it was another limited exception. And, again, if the city of San Francisco wanted to set prices on nonconsensual towing, that's fine. We don't have an argument. Well, you said earlier the predominant purpose was consumer protection. But in our 2011 ATA opinion, we said a mixed motive is okay as long as it was an important interest. So if safety is an important interest, even if consumer protection is more important, as in the 2011 ATA opinion, environment was probably the key, why isn't that good enough? I'm not suggesting that merely the introduction of another alternative purpose beyond safety, but consumer protection, environmental concerns, whatever it is, voids the whole permit scheme at all. I don't disagree with the mixed motive analysis in the 2011 case from this Court. What I'm suggesting, though, is you can put as many concerns as you want behind a bill, but the only thing that justifies an exception to preemption are the safety concerns you articulate. So you have to focus on those. All the other concerns are, to a large extent, irrelevant for the preemption analysis. What were your safety concerns? Well, let's take one, for example. We've been talking in generalizations, which I appreciate. It's useful. They did make specific findings with respect to public health and safety when vehicles of senior citizens and persons with disabilities are illegally towed from private property. So why isn't that a valid safety concern? Just as a for instance, if that's your concern, there are many ways you may address that concern, and I'm not suggesting that there's only one right way to do it. What I'm suggesting is the Supreme Court has said that if you want to take that as your safety concern, what you do in response has to be genuinely responsive. And as I tried to indicate in my brief, I think that suggests there needs to be some level of proportionality. We don't say, here's a small problem, and we're going to have this big scheme that covers everybody. Why don't we just target the people that engage in that type of towing? Because there's no way of knowing if somebody is going to pick up a car that's disabled or a senior citizen's car, right? I mean, none of your people you represent would know that necessarily, if the car is owned by a disabled person or a senior. But there's a concern there, a safety concern for those people. So don't you have to give a lot of leeway then to regulate to make sure you're protecting those people? I suppose the legislative body is entitled to some leeway. I would concede that. But the problem is what they've done in this case is say, okay, we can't tell who's going to tow a car illegally, whatever that means, from private property at night from a senior citizen. We don't know who that is. So instead what we'll do is we'll make every business do it, whether they engage in that type of towing or not, whether they have any record of towing illegally from private property of a senior citizen. We're going to impose all these regulatory burdens on them. We're going to say that they can't have drivers who have been convicted of check fraud, which has nothing to do with towing cars from senior citizens. We're going to say that they have to display the brochures in their business. We're going to impose all of these regulatory burdens that Congress was expressly trying to eliminate with deregulation to fix this very narrow subset of towing. And what's interesting is that the only evidence presented by the city was nothing that shows this had an actual effect in deterring the very types of towing they were concerned with, just that they suspected it would. The declaration from Sergeant Coggin was, well, in my experience, I think it would be better to do this on the front end. I think it's better to license people up front rather than try and go after them at the end when they actually commit the violation. Well, we don't have to check our common sense at the front door. I mean, if you do a criminal background check, a pretty broad criminal background check, and you find some firm has been engaged in, you know, criminal acts for years and years and years, you want to make sure they're not out there towing trucks nonconsensually from people who have no control over this. But I wouldn't want that firm towing at all. And yet that wasn't the concern expressed by the Board of Supervisors. This Court has said you don't have to take the legislative body at its word. You're, in fact, entitled to be skeptical about their concerns. This Court has never said the opposite. In other words, we can take the legislative body at their word and then expand upon their safety concerns that they never stated and assume that they were concerned with all sorts of other aspects of the towing industry. We can't do that. We can't imbue them with concerns that they didn't express. What if the regulation is simply, in a city with a lot of snow, that you have to have, you know, certain sort of chains available for your tow truck? I mean, obviously, that's safety-related. No question. And you just, on the face of it, you know that's safety-related. Correct. And you don't need to go a whole lot further than that for that regulation. Right. Speed limits, weight limits, those sorts of things. I mean, some things are going to be pretty obvious. Right. The problem is what is, by the mere fact of me having a permit, I don't think that makes it any more likely that I'm going to be a safe towerer, drive safely, not take cars illegally. I'm filling out paperwork, but that doesn't mean I'm going to change my business practice. What do you do with the California Vehicle Code, which itself articulates a legislative finding which authorizes the implementation or enactment of these towing ordinances? And it specifically talks about towing mistakes that may lead to violent confrontations, stranded motorists in dangerous situations, impeding expedited vehicle recovery, and wasting state and local law enforcement's limited resources. Of all of the cases, both in this circuit and around the country, that analyze the safety exception, I'm unaware of a single one that takes the findings and concerns of one legislative body and imports it into another act by a different legislative body. Wait a minute. Wait a minute. That may be the case, but I can, you know, the local, and we've had cases. There's a case on red light cameras that I was involved in, and there was a tremendous amount of interplay between the Washington state and the Seattle regulation. So I don't think you can blow it away just on the notion that if the state structure, which the state structure, as I understand it, does say that the local communities are governed by the state legislation. So if a board of supervisors is empowered to enact a regulation by a state statute, which sets forth the safety criteria, I don't know why the fact that nobody else has ever thought of the argument precludes us from considering it. So I don't buy that argument. I'd like to hear why it wouldn't apply here. I think it's because the precedent that we have to guide us is you have to look at the intent of the legislative body that's enacting the regulation being challenged. The state of California, in the vehicle code provision, didn't set forth the broad permit scheme that San Francisco later enacted. The city, the board of supervisors never referenced the vehicle code or tried to incorporate it as their intent. But why isn't that just one piece of the intent? I mean, it may not answer the full question, but why isn't that just one aspect that we can consider? I think that's what Judge Fischer said. I mean, why can't we consider that as a piece of the puzzle? Because they have to be delegated from the State this ability to regulate. And that delegation certainly suggests we're concerned with safety, including licensure, et cetera, et cetera. I think that that doesn't work for two reasons. One, the mere fact that the State legislature had a concern doesn't mean that all 480-some cities in the State of California have the same concern. That's why they have boards of supervisors to enact their own safety findings as the City did here. And secondly, I think it turns the analysis required by Ours Garage on its head. This Court has said you look to the intent and you can be skeptical. You don't have to take the legislative body at their word. You can look behind it. Here we're doing the opposite in saying, well, we're going to take what they said and we're going to import something else and try and cobble together a broad enough safety concern to justify the permit scheme. I think that begs the question. The vehicle code authorizes, says local authorities may adopt rules and regulation. It's an empowering statute. So I'm not sure whether the rule has to be that unless they cite the authority by which they act, we should simply ignore what the State legislature has declared. You may want to save your time for rebuttal. Thank you, Your Honor. Thank you. Good morning, Your Honors. Vince Chabria from the City and County of San Francisco. I only have a couple of brief points to add to the presentation we made in our briefs. One relates to the issue of findings. I don't think we should get too caught up in the findings contained in Police Code Section 3055.2. Those are findings that are specifically designed to justify the brochure requirement that Judge Ikuda referred to. And certainly those findings inform the City's intent with regard to regulating tow companies generally. But I think that there is evidence in the ordinance itself of legislative intent that's much more powerful than the findings justifying the brochure requirement. And that goes to the point, Judge Seabright, that you made, which is sometimes it's obvious. From what is being regulated, what its purpose is. If you require in a snowy area that tow trucks carry chains, we know that the purpose is safety. If the legislature criminalizes murder, we know the legislature doesn't have to include findings to explain why it's criminalizing murder. We all know why it's doing so. In this ordinance, we have a criminal background check. And we have a criminal background check that's designed to make sure that people who committed sexual assault, people who committed firearms offenses, people who committed various forms of theft, people who were convicted for driving while intoxicated are not allowed to engage in the towing business. And I just don't see any other purpose for that criminal background check. So if we agree with you on that point, but if there are other things in here, this gets to the mixed mode of analysis in the supplemental briefing, if there are other provisions that appear to be consumer protection. And the problem is, of course, consumer protection and safety can overlap. If you have a Venn diagram, there are places that are going to overlap and perhaps places they won't. But if you have some sort of separate consumer-oriented provisions in here and some sort of consensual-oriented provisions in here, it's going to overlap.  It's going to be consensual towing, especially as to the consensual towing. And I mean, I understand why Judge Breyer broke it up like this, because it seems to me there are very different concerns, safety concerns, between consensual and nonconsensual. I mean, if my car breaks down and I call somebody up, I'm not saying take me to the As I understand it, how do we break up the different provisions of the permit requirement? And that was, that always has been a somewhat vexing part of this case, because clearly this is a broad-based attack on the permit system. The argument, the primary argument is that the city simply can't have a permit system. I think that there are certainly some aspects of the permit system, not the criminal permit system or the brochure requirement, that have in part a consumer protection motive. But I believe that every aspect of the permit requirement involves safety to a certain extent, including the brochure requirement. And Judge Okuda, you raised that earlier. Let me explain why I believe there is a very direct nexus between the brochure requirement and safety. It's true, of course, that people do not receive their brochures until after they get to the tow yard to get their car back. However, the brochure informs them of their rights. And their rights are there must be a sign posted close to your parking space, otherwise it's illegal for them to tow it. The private property owner must be present for the tow, otherwise it's illegal to tow it. The ---- And they're informed of these things for the next tow? No. Is that ---- No. No. I think that would be a stretch for me to argue that. What I'm saying is that by forcing the companies to provide people with this information when they come to get their car, it creates a significant disincentive for the tow companies to engage in illegal tows. Because if someone comes back to get her car and she reads this brochure and sees that her car has been towed illegally for one reason or another, she is going to assert her rights. Whereas without that brochure, there's no reason to believe that somebody is going to learn of and assert their rights. So it's a great disincentive for the tow company to engage in illegal tow in the first place. So the safety issue is that by educating the people who come to tow of their rights so that they could sue the company, then the company will try to avoid being sued by not taking illegal steps. Is that how you would ---- That's what I'm saying. That's right. And the other point I'd like to make about the brochure requirement, and this is not just relevant to the brochure requirement but to the scheme overall and to this notion of consumer protection, is that the other thing the brochure informs the person of is the maximum price that can be charged for the tow. So that they won't beat them up, break out in violence over the high prices of the tow? Well, I think it's more relevant. You know, under the Tillerson case, it's relevant to that. But I also think it's more directly relevant to the price exception. I mean, we're telling the people who are coming to get their cars, they can't charge you more than this. So that aspect of the brochure requirement falls within the price exception for nonconsensual tows. Could you just briefly, as part of this discussion, just address my procedural question about did the district court do it wrong? Because in our 2009 ATA decision, we said you have to go provision by provision. Otherwise, you could wrap in a bunch of requirements that aren't in fact covered by the safety exception. I don't think so. Well, I think it was on the Tow Truck Association to identify specific provisions within the permit scheme that did not have a connection to safety or price, even if the others did. Did they not? I forgot. Counsel said, and I thought, just to clarify, he said that they focused on ten. Well, they did rattle off the aspect of the permit system that they were challenging. And the totality of that list is the permit system entirely. But there was never any argument about why a specific – for example, just as an example, the Tow Truck Association never went through the list of crimes for which we performed background checks to say, well, you can't perform a background check on this crime because this crime does not – if somebody committed this crime, that doesn't make it any more likely that this person is going to steal somebody's car or hurt somebody when they're coming to pick up their car. And so I think Judge Breyer did it right in light of the absence of argument on that. And I also think it's a fair point that I believe Judge Seabright, you made, that in – with the Port of Los Angeles, we were talking about a massive program that had a great number of subparts ranging from whether you're allowed to have independent contractors if you're a motor carrier, to how to maintain the car, to compliance with various environmental standards, to where you park. And each of those had subsets. And so – Just to clarify, there's obviously a level of generality issue. So there's the permit scheme as a whole, and then there are subparts, different parts of that scheme, and then there would be, you know, each individual subsection of the ordinance. And so just to clarify, did the truckers – did they – were they challenging this – only the scheme as a whole, or when you said they were – they did, I think you said, rattle off aspects of the permits. Were they – were they also arguing the subparts of the scheme? Well, I don't – I mean, I don't want to put words in Mr. Whalen's mouth, but I found the argument to be somewhat inscrutable because the – all of the argument was directed at the permit scheme generally. And the – they did tick off – you know, I don't know if this gets to a – gets us into a waiver issue. They did tick off all of the various code provisions that they took issue with. But it never got down to the level of the reason we take issue with this particular – you know, the criminal background check provision is because, you know, even if the other stuff relates to safety, this doesn't relate to safety for the following reasons. It never – it never got to that point. And – but I'm – you know, I believe that – as I said, I believe that every aspect of the permit system has a nexus either to safety or to price or to the requirement that the motor carrier, that the tow truck company carries insurance. So I have – Let me ask you a follow-up on that. And looking at the scheme, the chief of police has to grant the permit unless he makes one of five specific findings. That's right. As I'm reading this. And one of those is the applicant does not possess equipment or facilities necessary to operate a business in such a manner as to adequately protect vehicles of the public that are towed and stored from damage or theft, to protect them from damage or theft. Is that safety? At that point in time, once your car is there, if my car gets damaged at the tow truck facility, does that deal with – does that fall within the safety exception? I think you've identified the – probably the least direct – the provision that has the least direct connection to safety. But I do believe it still has a connection to safety. Because, you know, there's – there is – I think you have to split that provision into two conceptual components, if you will. The first is when the car is being towed. And, you know, the provision says that you have to have adequate equipment to ensure that a vehicle is not damaged when it's being towed. I think that relates to – that falls within the city's exercise of safety regulatory authority with respect to motor vehicles. To the extent that the provision speaks to the situation where the tow is already in the storage yard, again, it's more – I'll concede that it's more attenuated. But there can be instances where a vehicle is damaged and a person whose car is towed recovers the car, and that car is less safe to drive because of the damage that has been caused. All right. But the requirement is that he grants it unless he makes a finding, or she, the chief of police, in part that there's this safe storage from damage or theft. It has to be both. I mean, they have to be able to do both. Isn't that right? That's right. And like I said, I will concede to you that that's more attenuated. But I still think that even the safe storage aspect of that requirement is relevant to safety. Because you – you know, to the extent that your vehicle is damaged when it's in the tow yard and you come to get it, it might be less safe to operate once you've recovered it. Well, I have a question. We're having this dialogue, which you say didn't apparently occur in the district court. Is there a burden of proof issue here? In other words, if the tow truck association comes in and attacks the underpinnings of the scheme and then cites the various provisions, you said that they never pointed out the sub-level, for example, in the criminal background check, for example, counsel cited writing bad checks. I mean, what's that got to do with safety? Whereas, you know, if they're engaged in armed robbery or something like that, that might be a more obvious one. Or the one you just engaged Judge Seabright with. That level of dialogue and proof, I take it, did not occur in the district court? And if so, is it tow truck's problem for not having made the record, or is it that the city hasn't carried its burden of proof? Well, I think it's very much the tow truck association's problem. And just as a very brief aside, check fraud, somebody who commits check fraud is more likely to steal somebody's car, leaving them stranded. So I think that particular crime is relevant to the safety exception. But to answer your question, this brings us sort of to the somewhat nebulous standard of, you know, what does genuinely responsive to safety concerns mean, and whose burden is it to show that? And I think that, you know, clearly the city's burden is something more than your classic, you know, rational basis test in the equal protection context. We can't just come in and tell the court that any reason that the court could dream up to support this measure is sufficient. Right? But we have to come in with something. We have to come in with a legitimate explanation for why there is a nexus between this regulation and safety. Sometimes that may require evidence. Sometimes I think it may not. It just depends on how obvious the connection is. In this case, we did present evidence. We presented the declaration of Sergeant Coggin, which went through in significant detail the justifications for many of the different aspects of the permit system. Did we discuss every little aspect of the permit system line by line? No, we did not. Because, again, this was, we perceived this largely as a broad-based challenge to the permit system. So some of Sergeant Coggin's presentation was directed at the need for a permit system, as opposed to a proactive permit system, as opposed to a reactive one. Other aspects of Sergeant Coggin's presentation were directed towards specific aspects of the permit system that enabled law enforcement to better protect safety. But the bottom line, the nutshell, is that the other side did not present any evidence to rebut what clearly on its face was a strong presentation, that there is a legitimate, indeed a close connection, between the permit system and the need to protect safety with respect to motor vehicles. And would you comment on the vehicle code, state vehicle code, and the extent to which the city may or should not rely on it? Judge Fischer, I defended San Francisco's red light camera program, so I'm familiar, I was familiar with the example you brought up. And, as you know, it's the state that authorizes local governments to operate these red light camera programs. Let's make a distinction between what kind of red light issue we're talking about. And it makes no sense to say that the city has to repeat the findings of the state, that the state made when it authorized the city to embark upon the program. There's just no reason to do that. It is a strange law, this state law, because it first gives authority, and the authority it gives, the delegation, is extremely broad. And then it follows it with a finding after that. I don't know that I've ever seen a statute like that, where the findings sort of come at the tail end. But is it your view those findings in G-2 restrict the delegation in G-1? Do you understand the question? I do understand the question. And, no, I don't think the findings restrict the delegation in G-1. Because the delegation just says you can regulate the following matters, licensing and regulating the operation of tow truck service or tow truck drivers. I mean, that goes well beyond the safety exception, what's delegated, right? Yes, that's right. And so what do we do with G-2, then, where they have these specific findings? Well, G-2 came later, and it was in response to the specific issue of nonconsensual tows. And so I think they were speaking more narrowly at that time to the issue of nonconsensual tows. But as you – you look like you're going to ask another question. No, no, no. I'm looking at my notes. But as you mentioned, G-1 is a broad grant of authority, and that was enacted first. So G-2 was added afterwards as the findings. Yes. And that's probably why we have the strange order. Yes. I see. I only wanted to make, I guess, one more brief point about the consensual tow issue, since we lost on that below. And I will say that Judge Breyer was correct that none of the findings, none of the actual legislative findings spoke to consensual tows. And so in that respect, and certainly none of the findings supporting the brochure requirement spoke to the issue of consensual tows, because there's no – the brochure requirement is not about consensual tows. It's about nonconsensual tows. So there would be no reason in those findings to discuss the issue of consensual tows. And I would just like to reiterate the point I made at the beginning, which is that just because the legislature doesn't go out of its way to write findings does not mean the court cannot discern legislative intent from the language, from the regulatory language. And it's easy for the court to discern the legislative intent from the regulatory language in this case. Well, that may be true as to some of the examples that we've talked about. But if someone is out and calls a tow truck, they have asked – they're not being taken off of private property, well, wherever they needed it, but they're the ones who initiated the call. And they aren't going to be stranded because they've put themselves in the position. They don't walk out and find their car gone. So isn't that the kind of analysis that Judge Acuda was adverting to, which is when you move away from the nonconsensual, particularly when you say that the G-2 was directed at nonconsensual, so you can't even tie yourself to that. Why wouldn't the analysis that Judge Beyer did be appropriate, which is to say I can see and intuit and infer the safety connections on nonconsensual, but I don't see the logic for the consensual. So why doesn't that leave us agreeing with it? I see that my time has expired. May I answer Your Honor's question? Again, as Judge Seabright said, I don't think we need to leave common sense at the door. I mean, here's what happens. Let's say it's nighttime. You're out on the street. Your car breaks down. You call AAA. AAA contracts with a bunch of different independent contractor towing companies. You don't get somebody. When a truck comes to pick you up, it doesn't say AAA. It says Corte Madera Towing Company or whatever the local towing company happens to be that AAA is contracting with. It might be nighttime. They come and they tow your car, and you get in the car with them, and they take you somewhere. And so we perform background checks on these people for the same reason that we perform background checks on taxicab drivers. It's very important to us to know that the people who are picked up oftentimes at night when they are stranded in the middle of the street and nobody else is around are picked up by somebody who is not going to hurt them. And I think that, again, the specific language of the ordinance that goes to the background check and requires that a background check be conducted to make sure that somebody has not committed a crime of sexual assault or some other violent crime speaks loudly to the intent of the permit requirement and that there is an equal nexus between the permit requirement and consensual tows as there is between the permit requirement and non-consensual tows. Okay. Thank you. Thank you. I believe for you, Your Honors, just to respond to the level of generality, I'm sorry, with regard to the vehicle code section, the chronology is important, I think. We have the San Francisco Permit Scheme, I think in 1997, was originally enacted in 1997. Ours Garage comes down from the Supreme Court. In 2006 is when the California legislature adds G2, an apparent response to the Ours Garage decision to put the safety concerns in there. And then in 2009 is when the city goes back and makes the findings that we've been talking about here today. And I think why the chronology is relevant is that you have to look at the statutory scheme, both the California Vehicle Code and the city's permit scheme. They existed long before the Ours Garage standard, and it's only these after-the-fact findings that are made that are an effort to justify them. Well, what were they supposed to do? I mean, the Supreme Court comes along and says you have to make these connection, and so they come along and make the connection. That doesn't mean that they didn't have the concerns when they enacted them before Ours Garage. No question, but we have to take their concerns at their word and what they made very limited safety findings as we discussed. Secondly, with regard to the level of generality, our main focus, and as found by the district court, was a focus on the cost. I think Judge Breyer in his decision made that point two or three times, that this permit scheme is very costly. We were focused on cost, and we cited specifically the SF Police Code regard to that. But that's why you want to strike down the whole permit code. I mean, that gets to this question about subparts versus the whole thing. Your focus, because of what your clients want, is you don't want to pay this money. So you want this whole permit scheme thrown out. It doesn't do you any good, as you admit, to dissect it and perhaps get rid of some parts but still have to pay the full permit scheme. But here's the reality. The permit fee. I'm out of time. I'm almost out of time. The reality is this. Our folks already have to do background checks. They're required to do it by the CHP. So even if we don't think the background checks imposed by the city fall within the safety exception, it's irrelevant. What we don't like is having to do it twice and pay an extra fee for that. We've already done it once. You pointed out the discretion of the chief of police in granting or denying the permit, and you focused on sub 2. Sub 5, I think, is equally significant. The applicant does not possess or cannot obtain an FDIC-authorized bank credit card machine. Well, that has absolutely nothing to do with safety. We don't care because our guys already have those machines. There are a number of aspects of this permit scheme that don't have anything to do with safety. We didn't specifically challenge them below because, as a practical matter, it wasn't going to benefit us. The problem is that they've imposed a lot of requirements that we don't already have to do and made us pay for that in an exorbitant amount. Can I ask a question on that last provision? Because I was kind of questioning that. So that means that the tow yard has to take a credit card, essentially. Is that what that means? This provision of the code applies to tow firms rather than drivers. So, yes, I read that as requiring the firm to have that. Okay. So my car breaks down or somebody tows it because I parked illegally. I have to then get a bus out to the middle of nowhere. I don't know if I need $300 in cash or if I can just use my credit card. It seems to me it's safety-related to sort of have the assurance I don't need to have $300 of cash in my pocket going out to somewhere I'm unfamiliar with. Well, I guess I think Congress intended to do something in terms of deregulation. They had a broad express preemption and a narrow exception under safety. And I think if we read safety, as Your Honor just suggested or as Mr. Chavria did, everything can somehow be connected to safety. Sure, if we tell people their rights and then maybe more people will sue and then maybe that will be a deterrent and people won't do the thing, I mean, that becomes so attenuated that anything can fit within the safety exception. And you're over time. I have one clarifying question, though. You said that on background checks you already do them because you're required to by the State law, CHP.  Okay. So if that's the case, that's what I understood. And then you said we already do it and yet we have to do it again for the city and pay another fee. Correct. The fee is to whom? I think the way background checks work is you can either pay it to the local law enforcement agency or you can go to the Department of Justice. I think different cities have different rules in terms of what. And you can't use, it's not a dual purpose when you get one, it's not good for the other. A lot of our guys that do business in multiple cities have to do five and ten different checks. Okay. Thank you. All right, counsel, this is an interesting case. We appreciate the argument. And the case is submitted.
judges: Seabright, Fisher, Ikuta